_____ FILED          _____ ENTERED
_____ LODGED         _____ RECEIVED

OCT 21 2019

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN P. VERSCHOOR,

Defendant.

NO. CR19-208 JLR

**INFORMATION (Felony)**

The United States Attorney charges that:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

**A. Molecular Testing Labs (MTL)**

1.     Molecular Testing Labs (hereinafter "MTL") was a toxicology and genetics testing laboratory located in Vancouver, Washington.  MTL performed toxicology testing on urine specimens.  MTL was an approved Medicare provider and regularly submitted claims to federal health care programs for payment.

2.     Defendant STEVEN P. VERSCHOOR was a co-founder and the Vice President of Global Sales and Marketing for MTL.  In the role of Vice President of Sales and Marketing, VERSCHOOR was responsible for, among other things, managing the relationship between MTL and Northwest Physicians Laboratories (NWPL).

*United States v. Steven P. Verschoor*

INFORMATION - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        3.    Urine toxicology testing was often ordered for patients being seen by a

2    physician for pain management and prescribed opioids or similar medications.  These

3    patients were directed to submit urine specimens for toxicology testing in order to

4    monitor the levels of pain medication or other narcotics in their bodies.  These urine

5    specimens were usually sent to an outside laboratory that ran a particular panel of tests

6    based on the physicians' orders.  Testing laboratories typically billed the patients'

7    commercial insurance, or billed a federal health care program, or the patient himself or

8    herself, for performing urine toxicology testing.  Urine toxicology testing was a covered

9    service under Medicare and TRICARE, and most private commercial insurance, so long

10   as the testing was reasonable and medically necessary.

11   **B. Northwest Physicians Laboratories (NWPL)**

12       4.    Northwest Physicians Laboratories (hereinafter "NWPL") was a toxicology

13   laboratory located in Bellevue, Washington.  NWPL was owned by physician-

14   shareholders and by other equity owners who were called Common Members.  The

15   NWPL physician-shareholders were located in both Washington State and in other states

16   across the country.  NWPL was founded in 2012 and continued to gain physician-

17   shareholders in 2013, 2014, and 2015.

18       5.    Most of the NWPL physician-shareholders treated patients for pain

19   management and often prescribed opioids and other pain management medications to

20   their patients.  These physicians therefore sometimes required patients who had been

21   prescribed opioids and other pain management medications to submit urine specimens for

22   toxicology testing in order to monitor the levels of pain medication or other narcotics in

23   their bodies.  NWPL physician-shareholders generated thousands of these urine

24   specimens for toxicology testing.

25       6.    NWPL performed urine toxicology testing.  NWPL received almost all of

26   its urine specimens for toxicology testing from its physician-shareholders.  The

27   physician-shareholders directed their patients to provide urine specimens, and NWPL

28   collected these urine specimens and transported the specimens to its Bellevue,

*United States v. Steven P. Verschoor*

INFORMATION - 2

1   Washington, laboratory at no cost to the physician-shareholders.  NWPL employees

2   tested the urine specimens of patients covered by commercial insurance.  NWPL made

3   money by submitting these urine toxicology tests for payment to the patients' commercial

4   insurance.

5         7.    However, federal law restricted physicians from referring patients for

6   services, paid for by Medicare or other federal health care programs, to an entity that the

7   physician owned, like a physician-owned laboratory.  Further, federal law prohibited

8   paying anything of value for referrals payable by a federal health care program.

9   Therefore, NWPL did not test urine specimens from patients with federal insurance and

10  NWPL did not bill federal insurance.

11     **C. Federal Health Care Programs**

12        8.    The Medicare program ("Medicare") was a health care program

13  established under Title XVIII of the Social Security Act, to provide health care insurance

14  coverage for medical services for persons who were 65 years and older or disabled.

15  Medicare is a "Federal health care program" as defined in Title 42, United States Code,

16  Section 1320a-7b(f), that is, a plan or program that provides health benefits and is funded

17  directly, in whole or in part, by the federal government.

18        9.    The TRICARE program ("TRICARE") was a health care program of the

19  United States Department of Defense (DOD) Military Health System that provided

20  coverage for DOD beneficiaries world-wide, including active duty service members,

21  National Guard and Reserve members, retirees, their families, and survivors.  TRICARE

22  is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

23                           **<u>COUNT 1</u>**

24    **(Conspiracy to Offer and Pay Kickbacks Involving Federal Health Care Programs)**

25        10.    The allegations in paragraphs 1-9 are re-alleged and incorporated by

26  reference as if set forth in full herein.

27  //

28  //

*United States v. Steven P. Verschoor*

INFORMATION - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     **A. The Conspiracy**

2          11.     Beginning in or before February 2014, and continuing until in or about July

3   2015, at Bellevue, within the Western District of Washington, and elsewhere, Defendant

4   STEVEN P. VERSCHOOR and others (collectively the "Co-Conspirators"), did

5   knowingly and willfully conspire, combine, confederate, and agree among themselves,

6   and with other persons, to commit offenses in violation of the laws of the United States,

7   to wit: to knowingly and willfully offer and pay remuneration, directly and indirectly,

8   overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from MTL,

9   through VERSCHOOR and others, to NWPL, in order to induce the Co-Conspirators and

10   others to arrange for, and arrange for the ordering of, urine toxicology testing and related

11   services to be conducted by MTL for which payment was made in whole or in part under

12   a Federal health care program, that is, Medicare and TRICARE, in violation of Title 42,

13   United States Code, Section 1320a-7b(b)(2)(B).

14     **B. The Purpose of the Conspiracy**

15          12.     The purpose of the conspiracy was for MTL to pay money to receive urine

16   specimens, the testing of which had been ordered by NWPL physicians, and to test those

17   specimens, to submit claims to the federal government for these tests, and to receive

18   payment for those claims, in order to enrich MTL and its owners, including Defendant

19   STEVEN P. VERSCHOOR. The purpose of the conspiracy was also for NWPL

20   executives to enrich themselves, NWPL, and the NWPL physician-shareholders, by

21   obtaining money in exchange for arranging for these urine specimens to be transported to

22   MTL for testing. During the course of the conspiracy, VERSCHOOR directed MTL to

23   make $450,000 in kickback payments to NWPL. During the course of the conspiracy,

24   MTL submitted more than $2 million in claims to Medicare and TRICARE and received

25   more than $460,000 in payments from Medicare and TRICARE for urine toxicology

26   testing ordered by NWPL physician-shareholders that was arranged to be tested by MTL

27   by the Co-Conspirators.

28   //

*United States v. Steven P. Verschoor*
INFORMATION - 4

C. **The Manner and Means of the Conspiracy**

13.     Even though NWPL did not test urine specimens from patients with federal insurance, or submit bills to Federal health care programs, NWPL executives, including J.L., R.R., K.P., and others, directed the NWPL physician-shareholders to send all urine specimens that needed toxicology testing to NWPL's Bellevue laboratory, including those specimens from patients with federal insurance.  Once the federally-insured urine specimens arrived at NWPL's Bellevue laboratory, NWPL and its employees controlled the testing of these specimens.

14.     NWPL executives, including J.L., solicited MTL and sought remuneration in the form of kickback payments in return for arranging that urine specimens from federally-insured patients be tested at MTL, and based on the value of those urine specimens to MTL.

15.     In order to disguise MTL's kickback payments, in September 2014, STEVEN P. VERSCHOOR and J.L. signed a sham agreement called an "Administrative Services Agreement" that falsely described MTL's payments to NWPL as payments for services rendered by NWPL.  However, as the Co-Conspirators knew, NWPL did not perform all or most of the services listed in the Administrative Services Agreement and the Administrative Services Agreement was not an arms-length, fair market value contract.

16.     Rather than a contract for services, the Administrative Services Agreement reflected payment for arranging for urine specimens, the testing of which had been ordered by NWPL physicians, to be sent to MTL for testing.  Prior to signing the agreement, STEVEN P. VERSCHOOR, J.L., and others wrongfully agreed that MTL would pay NWPL approximately $50,000 per month for arranging for 500 urine specimens to be tested at MTL, and MTL would pay NWPL approximately $100,000 per month for arranging for 1000 urine specimens to be tested at MTL.

17.     Further, the Administrative Services Agreement required MTL to pay NWPL $68,500 per month for marketing services.  This amount was based on salary and

*United States v. Steven P. Verschoor*

INFORMATION - 5

1   expenses for 11 full-time NWPL employees to market MTL services, however, no such

2   NWPL employees marketed MTL services.   The Administrative Services Agreement

3   further falsely listed a series of marketing tasks that NWPL representatives were

4   supposed to perform on behalf of MTL.  In total, the Administrative Services Agreement

5   required MTL to pay NWPL $99,959 per month for a period of 12 months.

6        18.     The Co-Conspirators changed the amounts of the payments due under the

7   Administrative Services Agreement based on the number of urine specimens that were

8   ultimately sent from NWPL to MTL.  Despite the Administrative Services Agreement's

9   requirement that MTL make monthly payments of $99,959, STEVEN P. VERSCHOOR

10   caused MTL to make $50,000 payments to NWPL every month from October 2014

11   through June 2015.  The monthly payment amount was $50,000 because VERSCHOOR,

12   J.L., and others agreed that MTL would pay only $50,000 per month, not $99,959 per

13   month as required by the Administrative Services Agreement, because NWPL was not

14   sending the expected number of urine specimens to MTL.  The total amount of the

15   payments from MTL to NWPL caused by VERSCHOOR was $450,000.

16        19.     The Co-Conspirators back-dated a revised version of the Administrative

17   Services Agreement in order to hide MTL's kickback payments.  In April 2015, J.L. and

18   STEVEN P. VERSCHOOR signed the new version of the Administrative Services

19   Agreement and back-dated it to October 1, 2014.  This new version of the Administrative

20   Services Agreement changed the list of services that were allegedly provided by NWPL

21   to MTL.  The new version of the Administrative Services Agreement changed the

22   monthly service fee to $50,000, which matched the amount that VERSCHOOR had

23   caused MTL to pay.

24        20.     Shortly after the original Administrative Services Agreement was signed, in

25   or about September 2014, J.L. and other NWPL employees arranged for urine specimens

26   to be sent from the NWPL laboratory in Bellevue, Washington, to MTL.  Between

27   September 2014 and June 2015, NWPL employees caused over 1500 urine specimens

28   from patients with federal insurance, including Medicare and TRICARE, to be sent from

*United States v. Steven P. Verschoor*

INFORMATION - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Bellevue to MTL's Vancouver laboratory.  MTL conducted toxicology testing on these

2   urine specimens; and MTL submitted claims for payment for this urine toxicology testing

3   of more than $2 million to Federal health care programs.  In total, during this time period,

4   MTL received approximately $461,752.10 from Medicare and TRICARE for these

5   submissions.

6   **D. Overt Acts**

7       21.    During the course of and in furtherance of the conspiracy, STEVEN P.

8   VERSCHOOR, and others, committed the following overt acts, among others, within the

9   Western District of Washington and elsewhere:

10       a.  On or about November 7, 2014, STEVEN P. VERSCHOOR caused a wire

11   in the amount of $50,000 to be transferred from the bank account of MTL, to the bank

12   account of NWPL, located in Bellevue, Washington;

13   //

14   //

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Steven P. Verschoor*

INFORMATION - 7

1   b. On or about February 6, 2015, STEVEN P. VERSCHOOR caused a wire in

2 the amount of $50,000 to be transferred from the bank account of MTL, to the bank

3 account of NWPL, located in Bellevue, Washington.

4

5   All in violation of Title 18, United States Code, Section 371.

6

7   Dated this __17__ day of October, 2019.

8

9

10       TESSA M. GORMAN

11       Attorney for the United States,
        Acting Under Authority Conferred by 28 U.S.C. § 515

12

13

14       ANDREW C. FRIEDMAN
        Assistant United States Attorney

15

16

17       BRIAN D. WERNER
        Assistant United States Attorney

18

19       MATTHEW D. DIGGS
        Assistant United States Attorney

20

21

22

23

24

25

26

27

28

*United States v. Steven P. Verschoor*

INFORMATION - 8